Good morning. Our first case this morning is KANSAS GAS & ELECTRIC v. United States. Mr. Shapiro. Thank you, Your Honor. May it please the Court. The trial court's damages offset for a supposed benefit from Wolfreed's new rack is legally erroneous and must be set aside. This Court and its precedent predecessor have long established standards for assessing directness versus remoteness, and the claimed benefit for the new racks does not meet those standards to establish directness. Those standards require that the profits have to have grown out of the contract itself. There can't be two steps rather than one between the cause and the benefit. And here, the supposed profits that Wolfreed enjoyed came out of separate contracts for fresh fuel procurement, not out of the spent fuel disposal contracts. So separate transactions for fresh nuclear fuel are an impermissible second step. Another standard is that the benefit must be immediate, must immediately flow from the breach. It does not do so in this instance. The benefit is alleged to have occurred gradually over time as Wolfreed procured fresh nuclear fuel. Another requirement is that the cause must produce the event inevitably, not possibly, not even probably. Here, the benefit from procuring fresh nuclear fuel depended on the vagaries of the market for uranium enrichment, for fuel fabrication. It did not have to be the case that procuring more highly enriched fuel produced any benefit to Wolfreed. Another requirement is that there can't be any intervening incident between the cause and the effect. Here, the intervening incident is that Wolfreed decided to procure more highly enriched assemblies. Nothing about the breach required Wolfreed to do this. These facts are really in accord with the decision of this court in Hughes concerning the insurance issue, where in that case that was a claim damage that Hughes claimed because the government breach didn't launch the satellites. It had to use a private means to do that and incurred an additional cost for launch insurance because the private launches were more expensive. I'm not sure I understood your last point. You said nothing about the breach required them to procure the racks that they did? No, they were required to procure the racks, but Wolfreed was not required to procure after that. They weren't required to procure more highly enriched uranium. Even though that was apparently one of the objectives that they pursued when they decided to use the new racks. The objective was to have the flexibility to procure different kinds of fuel, including more highly enriched spent, not spent fuel, more highly enriched expression fuel. Or the infringement, wouldn't they have done the same thing? It just makes good market sense. But for the breach? But for the breach, yeah. There's nothing in the record to suggest that they might have. There is a trial testimony that indicates that it's possible that they could have procured more highly enriched fuel through using soluble boron, which might have enabled them to do that. The record is unclear on that point. But again, this is like the insurance in Hughes that this court found too remote. Nothing required Hughes to purchase launch insurance. That was something that that company decided to do, just as Wolfreed, in this instance, decided to purchase more highly enriched uranium after the breach. But the question is, would they have done it anyway? Is the breach irrelevant to that decision? Is it instead just good market sense that they would have pursued, and therefore the breach has not caused that particular aspect? The record is unclear on that point. There's not a finding from the trial court on exactly what kind of fuel Wolfreed would have procured but for the breach. It's our argument that the trial court didn't need to reach that issue. This court doesn't need to reach that issue because the procuring of some different kind of fresh nuclear fuel is too remote. It's another transaction. It doesn't grow inevitably out of the breach. It doesn't grow inevitably out of the mitigation of the breach. First, you have the breach. Wolfreed had to make a decision. What do we do in light of the government's failure to pick up spent nuclear fuel? It procures racks that can hold a thousand additional assemblies. Separate from that, then Wolfreed made a separate decision to procure fresh nuclear fuel that the trial court found saved it money on fresh nuclear fuel. That's a separate collateral transaction. But the reason they could do that was because they had more efficient rack. That might be, Your Honor, but whether or not that was the reason or not doesn't make it any less remote. For example, in the Dominion case, this court affirmed the trial court's refusal to even permit discovery into looking at whether the plaintiffs received a benefit from delaying payment of the one-time fee. If the court had permitted discovery into that issue, it's possible that the court would have found no question the plaintiff received a benefit from delaying paying the one-time fee. They were able to invest that money elsewhere and earn a greater return and that they did receive a benefit. But isn't their ability to purchase more highly enriched fuel an absolute capability that came with the new racks? In other words, they had at least the opportunity to do that inherently with the new racks. The new racks for sure gave them the flexibility. They possibly would have had the flexibility to do that without the new racks. But certainly with the new racks, Wolf Creek had that flexibility. But again, Judgment, it seems to be said of the investment returns on not paying the one-time fee in Dominion that this court did not even permit that issue to be explored. Possibly there would have been an additional investment return to the plaintiff in that case if they had paid because they paid the one-time fee later. This court correctly held it's just too far afield. For sure, that company had the flexibility in that instance to invest its funds differently. And maybe because it had the flexibility, it enjoyed a benefit from that. This court found that that issue was too far afield to be explored. The fact that the issue was explored very briefly before the trial court in this case doesn't change the legal ramification. That it's just some consequences are just too remote. Let me ask you a question by way of a hypothetical. Suppose we have a contract in which you're going to provide me with a home furnace. And you breach. And so by way of mitigation, I go out. And I discover that I pay a little more for a highly efficient furnace. But over the course of the life of the furnace, I save a lot in energy costs. And therefore, the total cost to me in effect over time of the furnace is less than the apparent cost of the furnace up front. What is my mitigation there? Do I get to charge you for the cost of the furnace up front? Or do you get to come back and say, well, wait a minute. You paid more up front. But you got a much cheaper furnace in effect than the one I was going to provide you. What would be the right analysis of that situation? The right analysis in that situation, if I understand the hypothetical correctly, is that the plaintiff in that instance could have procured the same furnace with the same efficiency if the plaintiff went out and procured a different furnace. That furnace was no longer available. So I went out and I got the high efficiency furnace. Do I get to charge you the full cost of that furnace? Or do you get a set off for the efficiency benefits of the furnace? I think it depends on issues such as you say there's an efficiency benefit. How much does that benefit work? What kind of, is it a gas furnace? Is it an electric furnace? I think there is issues that you'd have to work with. Let's assume the purpose of the hypothetical that it's worth enough to make the furnace that would have been more expensive than your furnace less expensive. It's possible that there is a benefit there if you can see that immediately from procuring the more efficient furnace that you're going to be able to save money. That's different than the case that we have here that merely procuring the racks gave you an opportunity. Depending on the vapories of the market, maybe that would be a benefit, maybe it wouldn't be a benefit. If you're buying a furnace, you're going to be using it to heat your home. And so you know that you're going to be purchasing fuel of some type to do that. In the racks in this instance, nothing required Wolf Creek to change the kind of fuel that it was procuring. That's a fairly complicated analysis that Wolf Creek had to do. And the record says Wolf Creek's fuel procurement department had to conduct an analysis to figure out do we want to go in that direction or not. So I understand the court's point, but there is a distinction between that situation and the one that we have here. I think this situation is much more similar to the Salt Pond. Remember there were two investments by the entity that basically took over the Salt Pond in that case. There was the initial $300 million that was required to mitigate the breach. The government basically required that $300 million investment. And so this court found what the benefit of- Mr. Shapiro, you keep using the word remote, saying this is too remote, but this was a direct aspect of the mitigation, wasn't it? It was in the course of mitigating the damages that they received this benefit. No, not at all. What they received was flexibility, Your Honor, and what the decisions of this court say is that mere flexibility, the mere flexibility to make a better investment with the money from the one-time fee, that you now have the flexibility to do something different with it other than immediately pay it to the court, that flexibility is not a benefit. We're not going to even explore whether or not that flexibility turned into a benefit or not. Woodbury could have had the flexibility, and depending on how they exercised it, they might have even made a bad bet and found out that the market forces went the other way and that they would have been better off procuring the older kind of fresh fuel. And then their mitigation expenses may have been more, right? Again, the precedent of this court, I would suggest that that additional cost from that additional transaction would not be a damage that Woodbury could recover, and by the same token, if there was a benefit from that subsequent transaction, that would not be a benefit all set. That's really what dominion teaches, that we don't look to see what happened from that second transaction. Briefly, I want to address the overhead issue. The trial court's own construction overhead calculation indisputably undercompensates plaintiffs for their overhead costs. It does this because there's no dispute about the size of the overhead pool. As recently as the government's response to our notice of new authority, they've conceded that the overhead pool size is correct. But what the trial court did, without any benefit from the parties after trial, it created its own calculation where it removed materials from only the rerack and not from any of Wolf Creek's other capital projects, which would necessarily cause an inappropriately large portion of the overhead to go to those other projects. The trial court's overhead calculation cannot stand. Wolf Creek's overhead calculation is reasonable, consistent with this Court's recent decisions and system tools. This Court should find the trial court's failure to award that overhead. What do you think is the right way to think about... Overhead, as everybody acknowledges, is something of a guesstimate anyway. So what do you think is the right way to approach an overhead problem? Should we be looking at, A, is this company's method of calculating overhead consistent over time and not simply cooked up for this particular case to get a benefit from this particular instance? B, is this consistent with GAAP? C, is it consistent with the regulatory requirements or permissions or all of the above? All of the above, Your Honor. But I guess I didn't ask the question very well. Should all of the above need to be satisfied or is it enough that any of the above is present? I think the key one, it would be unusual to have an overhead calculation, Your Honor, that if it had been used over a long period of time, as Wolf Creek's was in this instance, it would be unusual to have it used for a long time without being consistent with FERC, consistent with GAAP. I guess that's right. But in this instance, you have all three. You have Wolf Creek having a long-use overhead calculation essentially vetted from having been used that long that it's gone through the accounting process. It's certainly vetted through FERC. No one has found fault with it. It should have been FERC. Thank you, Mr. Jerome. You've consumed your rebuttal time, but we'll restore three minutes. Would you give an extra three minutes to Mr. Carney should he need to use it? Then we'll have our time equal. Mr. Carney? May it please the Court. I'll start with the benefit-conferred issue before turning to the overhead issue. The evidence at trial... Where do we draw the line on remoteness? Well, in this case, Your Honor, there was no remoteness because the benefits were literally built into the racks themselves. The evidence at trial, the undisputed evidence at trial, showed, as Judge Bryson had mentioned, that there were two objectives to the RE-RAC project. One was to install racks that added more space, and the other co-equal objective was to allow for the installation of racks that allowed for higher emission fuel. So those were the two objectives going into the mitigation project. But Mr. Shapiro argues that, well, the additional flexibility, the additional capability doesn't count because that's just too remote. Well, Your Honor, I would submit that the evidence  when they began the mitigation project, they were going to have these racks that allow for higher emission fuel. They began immediately after the installation of the new racks using the higher emission fuel that they couldn't use before. The trial court's finding that there was a benefit was supported by the testimony of engineers, particularly Mr. Morris, and this is at JA-122, said that the RE-RAC is what allowed us to use the higher emission fuel. And the question of whether it's dependent on the vagaries of the transactions or not, as Mr. Shapiro had referred to, I think is answered by the testimony of the CEO, Mr. Minch. He says twice, and this is at JA-311 and JA-312, he said twice that as long as we continued using that higher emission fuel, we were going to enjoy this financial benefit. He didn't say, well, we're going to have to go look at the market and see if it's to our advantage to use higher emission fuel. He was asked, how long will this benefit continue? And he said, as long as we continue to use higher emission fuel. Do you think that the same principle would apply on the damages side that applies on the mitigation reduction or offset side, so that if it turned out, contrary to everybody's expectations, let's say that instead of actually saving money, the re-racking cost more money than had been anticipated, would all that be added to the mitigation damages? Your Honor, I think in the circumstances, I think you're describing the fuel for whatever reason had become more expensive. Yes. I think they could have an argument that... Would you agree with that argument? What I think they would need to show is that their mitigation in that circumstance was reasonable. I think that they would have to show that they did their best to install racks that would have allowed them to use fuel that was either as expensive as the fuel they had before or less expensive than the fuel that they had before as they did here. But I think if there was a circumstance beyond their control and they mitigated to the best of their ability... Where I'm going with that, if I can... Let me just save you some time here. Obviously, the question at the end of the line is suppose that something really surprising happens in the market during the course of the mitigation and that re-rack that they chose reasonably at the time turned out to be much more expensive. That gets added to the damages? Your Honor... The market spikes for high enriched uranium. So does that get added to the damages for the mitigation, the cost of mitigation? Your Honor, what I was getting at in my response in terms of the reasonableness of mitigation is that these new racks allowed for the use of high enrichment fuel but they also allowed... Suppose that they had not allowed for the choice but they had just made a choice to go with a pure high enrichment system and that it turns out that the high enrichment system turned out to be much more expensive unbeknownst to them at the time that they procured it. Would that be added to the government's damages or would the government be saying to us, well, that was just a market factor that no one could have anticipated and therefore we're not on the hook for it? Your Honor, I think if they were able to show that their mitigation was reasonable and... At the outset. At the outset. Because of their mitigation, they were required to do something that cost more than they had been doing before and they could show... I think that could be a situation where damages were increased. Isn't the answer market fluctuations are always unforeseeable... The fluctuations in the market are foreseeable that they're going to happen. What they are is unforeseeable, of course, but we know the market's going to fluctuate so they aren't vagaries. Is there what's expected, right? Right. And, Your Honor, I think the evidence here was that they had done an economic evaluation that showed even though, on the whole, higher enrichment fuel tends to be more expensive than lower enrichment fuel, which makes logical sense that by using higher enrichment fuel, they were going to discharge for fewer assemblies per cycle because the fuel lasts longer. And so, I would assume, I don't know a lot about the uranium market, but that the prices of uranium would rise on both counts, for the lower enrichment fuel and for the higher enrichment fuel, much the same way the gasoline prices, if you had the premium gas and you had the regular gas, that you're going to see that rise in parallel. But here, the economic evaluation they did said that, taking that into account, that using fewer assemblies that are more expensive, generally, is going to save us money than using more assemblies that are going to be less expensive and that they did that evaluation and Mr. Lynch said, as long as we continue to use higher enrichment fuel, we're going to enjoy this benefit. But for the breach, the market would have done the same thing, the same steps would have been taken to mitigate and that's your argument, isn't it? Your Honor, I think you could have a situation where, and as Mr. Shapiro said, the evidence in the record doesn't suggest that they would have installed the racks anyway, even if DOE had performed, but you did have a situation like that in the Carolina case, where the court altogether awarded none of the costs of a re-rack because it found that the, the trial court, that is, found that the reasons for undertaking the re-rack, the second objective, the non-mitigation objective, was so compelling that they would have done it anyway and fought for a while. Here, the trial court didn't make that finding, it didn't even split the cost in half and said, I'm going to give half to you for mitigation, I'm going to give half to the government as a benefit. Here, it made a very conservative estimate and only calculated the benefit that they realized through this particular partial breach damages claim period and set it at $800,000, and I think, so it did take a very conservative approach, but you're right, you could have a case where, as in Carolina, where the reason was so compelling that the evidence showed that they would have done it anyway. With respect to the overhead question, it seems to me that everybody acknowledges the fact that when the trial court took out of the mix the materials costs that left a calculation that perhaps was, was below what it should be for overhead costs. What's your reaction to that, or am I misunderstanding the facts? That would not be our position, Your Honor, that she were too low of overheads. In fact, our position is that she exercised her, the discretion afforded to her under Carolina Power and under this Court's other decisions that allow for the trial court-wide discretion to determine damages, and the trial court specifically relied on this Court's decision in Precision Pine where it said that the trial court can accept the plaintiff's arguments to some degree and perhaps not accept the plaintiff's methodology and make adjustments to that methodology. So what the trial court did here was that I accept the fact that you're entitled to recover construction overheads. I accept the fact that the construction overhead pool is related to the mitigation. However, I think that the total cost allocation method that you use to calculate overheads does not equate properly to damages in this case. And why not? Because you included all of your subcontractors' materials in the allocation base and in effect put a 40% surcharge on those subcontractors' materials. But Kansas Gas had always accounted for its overhead according to this business practice, hadn't it? Yes, that's what the evidence shows is that they had... So they followed their standard practice. Why aren't they entitled to follow their standard practice that they would have used with or without a breach? I think they're entitled to follow the standard practice for their own business purposes and that's what the trial court recognized. What she also recognized is that the allocation method used to calculate overheads must bear some relationship to the resources actually expending. And that in particular is consistent with this court's decision in Energy Northwest and in Southern California Edison where this court said that the trial court had an obligation to look at the method that the plaintiffs are using to prove their overheads and see does this establish damages with reasonable certainty. I guess the question is why isn't it per se fair and reasonable when they've been using the practice for the duration of their business? Your Honor, I think to say that it's per se reasonable would be inconsistent with the trial court's obligation under this court's precedent to evaluate the methodology and see does it comport with a fair calculation of damages. And even if this court were to establish a rule that there's a rebuttable presumption that the use of methodology for many years is a fair way of calculating damages, here the trial court found that the government had rebutted that presumption. We put on expert testimony from the accounting expert who said when you use this total cost allocation methodology it's important to back out things that might distort the calculation of overhead such as large subcontractor costs. Candidate Gatz hired an accounting expert of their own in an effort to rebut our accounting expert. He cited a number of authorities and our expert was able to show that each of the authorities that he cited, and this is referenced in the trial court's opinion, and this is at JA 51 and our expert's testimony that JA 496 to 97, that each of the authorities that their expert relied on said that you need to be careful in using the total cost allocation methodology to back out large distortive items that might cause too many overheads to be allocated to a particular case. Now, I think you alluded to this in your brief and now I can't remember exactly how you characterized this, but was your accounting expert saying that in order to have the ideal, rational, or at least a more rational overhead allocation you need to back out from business costs, or was he saying that in order for this to be a recognized and conventionally employed acceptable method of allocation of overhead, you have to back out those costs? Because those are two pretty different things it seems to me. You understand my question? I may have not made it clear. In other words, the first one was, was he simply saying in order to have something that really is a sensible way to look at overhead in my view as an expert, this is the way you should do it, i.e. a kind of ideal scheme for doing the best you can with determining the proper allocation of overhead, or is he saying that this isn't accepted by anyone, this is just goofy? Your Honor, I would submit he was saying a little bit of both, but I think more to the first point that a proper cost allocation system, that this is something that there's a lot of flexibility given to individual companies, but that a proper cost allocation system, particularly when using to determine damages, shows a cause and effect relationship between the overhead and the resources that are being expended. So that's sort of a general principle, but I think he also found that this method was not one that was widely accepted, and he cited surveys from their accounting experts own textbook that this didn't even appear in the list of overhead allocation methodologies used as a widely used type of... It wouldn't be consistent with GAAP? Your Honor... Or is that even a pertinent standard here? Your Honor, with respect to GAAP, my understanding of GAAP, I confess I'm not an expert in this, is that GAAP is really concerned with external reporting and how things are reported externally... That's great. ...on financial statements, and that this is more about internal cost accounting, and so I don't know that the record's clear or not whether this is something that is consistent with GAAP or whether GAAP speaks... Even doesn't speak to it. Right. And I'm just... I can't answer that question. Thank you. And... So the trial court's own calculation was... I think to get back to your original question was that it might not have been the best in terms of the most precise way of calculating overhead, but it was consistent with the trial court's duty to calculate a fair and reasonable approximation of damages, and it certainly was much more consistent with appropriate order of damages than the plaintiff's $3.4 million claim for overhead. And the trial court was looking at this in the context of a claim where the plaintiff's own direct labor on this project was $600,000, yet the overhead that they allocated to the project using this method was worth $3.4 million. And the subcontractor, Holtec, at the trial court recognized that in designing and fabricating the new racks, it also removed the old racks and disposed of them and then installed the new racks. But when you back out the material costs, the $6 million in material costs, you wind up with an overhead pool of $3.4 million that's being claimed that's more than that remaining aspect even of Holtec's charges. And so I think the trial court was looking at this as a whole and said that this allocation methodology has resulted in more overheads being allocated to damages than can be fairly attributable to the re-rack. And in fact, found that the government had established that the expense of material costs bore no relationship to the plan's resources expanded on the project. And so, from our perspective, she was well within her discretion to make that determination. And I think getting to the issue that we had raised on cross-appeal, which might have prompted your question, I think we were saying that the trial judge did the best that it could with the evidence available. There was no other alternative accounting proposal submitted by the plaintiff, correct? Exactly, Your Honor. Thank you, Mr. Carney. Mr. Schapiro, you have three minutes. Thank you for that additional time, Your Honor. I want to get back to the benefit issues and something that you said, future trader, that wouldn't, Wilkrieg would've done this anyway. And the evidence does not indicate that, Your Honor. The evidence, all the testimony credited by the trial court, found by the trial court, is that Wilkrieg re-racked because of the breach, because it was running out of space. It is merely an engineering document noting, you know, why are we re-racking? There's an additional reason noted in that engineering document. The trial court did not come close to saying they would've expended 10, 14 million dollars anyway to get this additional flexibility on fuel procurement. I want to get back to your hypothetical about the furnace, Judge Bryce. I think the example might be more similar if I could tweak it a little bit. Of course, there's nothing about hypotheticals. You could've changed the facts. Suppose you have a contract to repair a gas furnace and someone breaches the contract, you end up destroying the furnace. And you have to mitigate, you can't have a cold house, you have to mitigate, you buy a new furnace and rather than buying the same furnace, you buy a dual fuel furnace, which they make now, that can run on either gas or electricity. If one could show that replacement furnace was more expensive when you bought it, it gave you a benefit as measured by the fact that it was more expensive, maybe that should be deducted from damages or really not included as a damage because you over-mitigated in that sense. That's not what we have here. There's no evidence to indicate that the replacement racks were any more expensive than racks that Wolf Creek theoretically could have procured that could not have handled more highly enriched fresh fuel. But if you wanted to claim well after I procured this dual fuel furnace, I made the wrong bet and I started to use gas and I found out later I should have just stuck with the electricity or something like that. That, I would submit, would be a remote consequence of the mitigation and would not be recoverable. What we have here is that same kind of remote consequence after the mitigation there are additional transactions that, as it turns out, Wolf Creek may have benefited from but that's no different than... Why would that be remote? I don't see any remoteness there. The weather is going to get colder or warmer and we can't predict the weather and whether he had to use more electricity would have had to use more gas in the colder weather. But suppose it might depend on the market for gas versus electricity? And we fully understand that the market is going to fluctuate so that is not an unforeseeable consequence. It's not a vagary. That is built into the whole equation, isn't it? No, it's not built into the into the equation. We're not. You might benefit. You might not. There's a whole separate... Understood. If you benefit, it goes one way. If you don't, it goes the other. Well, why is that different? I would argue it's not different than the situation in Dominion where the courts did not even permit the possibility that you could have made an alternative investment with your money rather than paying it into the government. And like a lot of investments, maybe Dominion would have benefited from that alternative investment. Maybe it would have lost money. And with this court said either way, benefit or loss, that is too remote to be explored. For sure, Dominion had to do something with its money. It had that flexibility. In fact, it's required to hold on to the money. But what they did with it surely depended on vagaries and you would say the natural foreseeable flexibility in the investment market. This court appropriately held that that doesn't matter. All right. Thank you very much. Our next case is Donald...